IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN-DUBUQUE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. CR 16-1045-LTS |
| | ) | |
| vs. | ) | |
| | ) | |
| ANTRELL DESHARRON LEWIS, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S TRIAL MEMORANDUM**

I. **PRE-TRIAL STATEMENT AS TO THE STATUS OF THE CASE**

a) This case is set for trial on February 28, 2017.

b) The estimate of the probable duration of the trial is 3 days.

c) The defendant is detained.

d) An interpreter is not required in this matter.

e) The parties have notified the Court that they consent waiver of jury. The case is presently set as a bench trial.

f) The defendant is charged with two counts: conspiracy to distribute heroin and furanylfentanyl resulting in death and serious bodily injury (Count 1) and distribution of heroin and furanylfentanyl resulting in death and serious bodily injury (Count 2). The elements for these charges are as follows:

1

**Count 1:** **Conspiracy to Distribute Heroin and Furanylfentanyl Resulting in Death and Serious Bodily Injury (21 U.S.C. §§ 841(a)(1), (b)(1)(C), 813, 846)**

*One*,  during at least March 2016, in the Northern District of Iowa, two or more persons reached an agreement to unlawfully distribute heroin, a Schedule I controlled substance, and furanylfentanyl, a controlled substance analogue[1], in violation of 21 U.S.C. §§ 841(a)(1);

*Two*,  defendant voluntarily and intentionally joined the agreement or understanding either at the time it was first reached or at some time while it was still in effect; and

*Three,*  at the time he joined the agreement or understanding, defendant knew the purpose or purposes of the agreement or understanding.

As a **sentencing factor**, the government would have to prove beyond a reasonable doubt that another person's use of the heroin and furanylfentanyl defendant conspired to distribute or distributed in furtherance of the conspiracy resulted in serious bodily injury to that person.   In this case, the Indictment alleges the conspiracy to distribute heroin and furanylfentanyl resulted in serious bodily injury to A.K. and M.V. on or about March 3, 2016, and resulted in the death of J.S. on or about the same date.

    8th Cir. Model Jury Instruction 6.21.846
    *United States v. Wright*, 15-CR-46-LTS (N. Dist. Iowa)
    United States v. Anwar, 15-CR-2005-JAJ (N. Dist. Iowa)

**Count 2:** **Distribution of Heroin and Furanylfentanyl Resulting in Death and Serious Bodily Injury (21 U.S.C. §§ 841(a)(1), (b)(1)(C), 813,**

*One*,  on or about March 3, 2016, in the Northern District of Iowa, defendant knowingly and intentionally transferred to another person a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, and/or furanylfentanyl, a Schedule I Controlled Substance Analogue as defined in 21

---

[1] The elements for distribution of a controlled substance analogue are listed below for Count 2.

U.S.C. § 802(32)(A), knowing that the mixture or substance was intended for human consumption as provided in 21 U.S.C. § 813; and

*Two*, at the time of the transfer, the defendant knew that the substance he transferred to the other person was some controlled substance, that is, some substance regulated by federal drug abuse laws.

As a **sentencing factor**, the government would have to prove beyond a reasonable doubt that another person's use of the heroin and furanylfentanyl defendant distributed resulted in serious bodily injury to that person. In this case, the Indictment alleges the use of heroin and furanylfentanyl distributed by defendant resulted in serious bodily injury to A.K. and M.V. on or about March 3, 2016, and resulted in the death of J.S. on or about the same date.

8th Cir. Model Jury Instruction 6.21.841B
*United States v. Wright*, 15-CR-46-LTS (N. Dist. Iowa)
*McFadden v. United States*, 135 S.Ct. 2298 (2015) (analogue elements)
*United States v. Ramos*, 814 F.3d 910 (2016) (analogue elements)

(h) **Relevant Statutes and Law**

**Distribution of Controlled Substances**

Title 21, United States Code, Section 841(a)(1), provides:

[I]t shall be unlawful for any person knowingly or intentionally to . . . distribute . . . a controlled substance.

**Controlled Substance Analogues**

Title 21, United States Code, Section 813, provides:

A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any federal law as a controlled substance in schedule I.

Title 21, United States Code, Section 802(32) defines "controlled substance analogue" as a substance:

(i) the chemical structure of which is substantially similar to the chemical

3

    structure of a controlled substance in schedule I or II;

 (ii)  which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

 (iii)  with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

  The Eighth Circuit Court of Appeals recently summarized the mens rea standard for controlled substance analogues:

> as with prosecutions involving substances listed on the drug schedules, the Government did not need to present direct evidence of [the defendant's] knowledge of the analogue's nature and effects. Instead, the Government could satisfy its burden through circumstantial evidence of knowledge. *See United States v. Carlson*, 810 F.3d 544, 552 (8th Cir. 2016). Examples of such circumstantial evidence in analogue cases include "a defendant's concealment of his activities, evasive behavior with respect to law enforcement, knowledge that a particular substance produces a 'high' similar to that produced by controlled substances, and knowledge that a particular substance is subject to seizure at customs." *McFadden*, 135 S.Ct. at 2304 n. 1.

*United States v. Ramos*, 814 F.3d 910, 917 (8th Cir.), as corrected (Feb. 23, 2016), cert. denied, 137 S. Ct. 177, 196 L. Ed. 2d 146 (2016), and cert. denied, 137 S. Ct. 177, 196 L. Ed. 2d 146 (2016)

  **Death or Serious Bodily Injury**

  Title 21, United States Code, Section 841(b)(1)(C) provide for enhanced penalties where "death or serious bodily injury results from the use of [the] substance" that was distributed in violation of 21 U.S.C. § 841(a)(1).

  As this Court instructed the jury in *United States v. Max Julian Wright*, CR15-46-LTS, to find that the death resulted from the substance defendant distributed (or conspired to distribute), the Court must find beyond a reasonable doubt that the charged injuries and death would not have occurred but for the use of

4

the same heroin and/or furanylfentanyl transferred by Antrell Lewis (Counts 1 or 2) or by another member of the conspiracy in furtherance of the conspiracy (Count 1).

In *Wright*, this Court instructed the jury on the proper standard for "but for" causation under *Burrage v. United States*, 134 S.Ct. 881 (2013). In *Wright*, this Court instructed the jury that the prosecution:

- must prove that death resulted from the unlawfully transferred Heroin and/or Fentanyl, not merely from a combination of factors to which the drug use contributed. This is known as "but for" causation. For example, where A shoots B, who is hit and dies, we can say that A caused B's death, since but for A's conduct B would not have died. The same thing is true if a person's act combines with other factors to produce the result, so long as the other factors alone would not have produced the result — the straw that broke the camel's back, so to speak. Thus, if poison is administered to a man debilitated by multiple diseases, the poison is a "but for" cause of death even if the diseases played a part in his deterioration, so long as, without the effect of the poison, he would have lived.

- need not prove that the defendant intentionally transferred Heroin and/or Fentanyl directly to [the victim] so long as the prosecution proves beyond a reasonable doubt that Heroin and/or Fentanyl transferred by the defendant is the same substance that later caused the death of [that victim].

- need not prove that the defendant intended to cause serious bodily injury or death. Similarly, the law does not require the prosecution to prove that defendant knew or should have known that he was exposing [the victim] to a risk of death when a member of the conspiracy transferred Heroin and/or Fentanyl to that individual. If you find beyond a reasonable doubt that the defendant under consideration distributed or conspired to distribute Heroin and/or Fentanyl that later resulted in the death of a user, then the defendant is responsible even though he did not intend that the user die or be injured, so long as it was reasonably foreseeable to defendant that death or serious bodily injury was a consequence of using the substances he conspired to distribute.

## II. POTENTIAL EVIDENTIARY ISSUES

**a)** **Expert Testimony** – The United States may present expert testimony in various forms in order to prove the elements of the offenses. First, the United States will offer the testimony of one or more experienced drug agents to testify as an expert witness regarding drug trafficking generally. *United States v. Gill*, 513 F.3d 836, 847 (8th Cir. 2008) ("[A] district court has discretion to allow law enforcement officials to testify as experts concerning the modus operandi of drug dealers in areas concerning activities which are not something with which most jurors are familiar." (quotation omitted)). The agent(s) will testify regarding the various methods of distributing, packaging, concealing heroin, prices associated with various quantities of heroin in eastern Iowa, and the effects of heroin use on a person.

Proper testimony in this area includes testimony regarding "user-versus-seller" drug quantity amounts. *See United States v. Mabry*, 3 F.3d 244, 247-48 (8th Cir. 1993) ("[W]e agree with the district court that most jurors would not know what size vials users and sellers of PCP typically favor"), *abrogated on unrelated grounds* by *United States v. Sheppard*, 219 F.3d 866 (8th Cir. 2000); *United States v. Franklin*, 728 F.2d 994, 997-98 (8th Cir. 1984) ("It is undisputed that the average dosage unit of cocaine is not information within the common knowledge of lay persons"). Testimony about the forms, sources, prices and dosage units of various drugs has also been approved. *See United States v. Martin*, 869 F.2d 1118, 1121

(8th Cir. 1989). The United States may also offer testimony of experienced drug dealers and users who similarly may testify, based on their own personal knowledge, about the trafficking of heroin and related activities. *See United States v. Lowe*, 9 F.3d 43, 46-47 (8th Cir. 1993); *United States v. Mabry*, 3 F.3d 244, 247 (8th Cir. 1993); *United States v. Boykin*, 986 F.2d 270, 275 (8th Cir 1993). The United States does not anticipate there being any issues with "dual role" expert/lay testimony by the case agent. *See United States v. Moralez*, 808 F.3d 362 (8th Cir. 2015) (discussing "dual-role" testimony, where a case agent testifies both as an expert and a fact witness, and discussing safeguards to avoid potential prejudice from dual-role testimony, such as bifurcation of testimony, using clear transitions during questioning, or giving jury instructions regarding expert testimony).

Finally, the United States will offer the testimony of two medical experts regarding the death and serious bodily injuries. With respect to the cause of the death of J.S., the United States will call a former medical examiner from the State of Iowa (now a medical examiner in the State of Tennessee), Dr. Julia Goodin. Dr. Goodin conducted the autopsy of J.S. and will testify that J.S. died as a result of the acute application of heroin and furanylfentanyl – that is, that J.S. died as a result of using heroin and furanylfentanyl.

With respect to the injuries to A.K. and M.V., the United States will offer the testimony of an experienced emergency room physician and deputy Medical Examiner from Linn County, Iowa, Dr. Joshua Pruitt. Dr. Pruitt will testify

7

regarding the cause and extent of injuries to A.K. and M.V. Specifically, Dr. Pruitt will testify that the injuries to A.K. and M.V. were the result of the use of an opiate. Additionally, Dr. Pruitt will testify that the nature of the injuries in each instance (such as the lack of consciousness, a slowed pulse, and severely slowed or nonexistent breathing) indicated that each victim had a substantial risk of anoxic brain injury and death at the time he was encountered by medical personnel.

**b)** **Testimony of First Responders and Medical Personnel --** The United States will offer the testimony of treating medical personnel, including responding paramedics, concerning their observations of the victims.

**c)** **Laboratory Reports.** The United States will offer laboratory reports of the drugs purchased and seized by law enforcement during the investigation. The United States will introduce these reports pursuant to Federal Rule of Evidence 803(6) as records of regularly conducted activity. *See United States v. Baker*, 855 F.2d 1353, 1359-60 (8th Cir. 1988). If no stipulation is reached by the parties regarding the admissibility of the lab reports, the United States anticipates calling criminalists with the Iowa DCI Laboratory to testify regarding the substances purchased or seized.

**d)** **Surveillance Video.** The United States will offer a video recorded by a surveillance officer showing a defendant's involvement in the distribution of heroin on March 31, 2016. The sound from the video has been removed to avoid any hearsay issues.

**e)** **Audio Recordings and Transcripts**. The United States will offer multiple audio recordings. These include recorded phone calls prior to two controlled buys and audio recordings of the controlled buys themselves. The United States has prepared transcripts for each of these audio recordings.

**f)** **Co-Conspirator statements** -- The United States will offer statements made by co-conspirators during and in furtherance of the conspiracy. *See*, Fed. R. Evid. 801(d)(2)(E); *Bourjaily v. United States*, 483 U.S. 171 (1987). Such statements are admissible if the prosecution demonstrates by a preponderance of the evidence that (1) a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course of and in furtherance of the conspiracy. *United States v. Bell*, 573 F.2d 1040, 1043 (8th Cir. 1978). Co-conspirator statements are admissible whether or not the defendant is charged with the crime of conspiracy. *United States v. Smith*, 596 F.2d 319, 321 (8th Cir. 1979); *United States v. Scavo*, 593 F.2d 837, 845 n.4 (8th Cir. 1979).

The Eighth Circuit has established a procedure to be followed when admissibility of a co-conspirator statement is at issue. The trial court should conditionally admit the statement, subject to the requirement that the government prove by a preponderance of the evidence that the statement was made by a co-conspirator during the course and in furtherance of the conspiracy. *Bell*, 573 F.2d at 1044; *United States v. Wood*, 851 F.2d 185, 187 (8th Cir. 1988). The

co-conspirator statement itself may be considered by the Court when determining whether the government has satisfied its burden of proof. *Bourjaily*, 483 U.S. at 176-81; *Wood*, 851 F.2d at 189.

Statements made "in furtherance" of a conspiracy include, but are not limited to, those identifying other co-conspirators or a co-conspirator's source of supply for illegal drugs, *United States v. Meeks*, 857 F.2d 1201, 1203 (8th Cir. 1988); *United States v. Lewis*, 759 F.2d 1316, 1348 (8th Cir. 1985); discussing a co-conspirator's role in the conspiracy, *United States v. Johnson*, 925 F.2d 1115, 1117 (8th Cir. 1991); apprising a co-conspirator of developments in a conspiracy, *United States v. Jackson*, 549 F.2d 517, 533-34 (8th Cir. 1977); giving directions to facilitate the conspiracy, *United States v. Massa*, 740 F.2d 629, 638 (8th Cir. 1985); serving to insure good relationships for future business, *United States v. Eisenberg*, 807 F.2d 1446, 1454 (8th Cir. 1986); and preserving the conspiracy and foiling attempts at detection. *United States v. Williams*, 87 F.3d 249, 253-54 (8th Cir. 1996).

Here, the co-conspirator statements the United States expects to introduce include statements made by a co-conspirator, Joshua Manning, to another co-conspirator Jeremy Naderman, including statements about the price and quantity of heroin they were going to obtain, as well as the identity of the heroin supplier. *See Lewis*, 759 F.2d at 1348 (statements identifying a co-conspirator as a source of narcotics and statements made to induce a co-conspirator to act are admissible under Rule 801(d)(2)(E)).

Additionally, statements made by Antoine Mitchell during a controlled buy of heroin on April 8, 2016, will be admissible under Rule 801(d)(2)(E). The evidence will show that on March 31, 2016, defendant sold heroin to a confidential source in a transaction that was arranged by the confidential source calling a phone number with the last four digits being -8904. On April 8, while (unbeknownst to the confidential source and the controlling agents) defendant was incarcerated, the confidential source contacted that same phone number and purchased heroin from Mitchell in anther controlled purchase. The United States will offer the recorded phone call and recording of the transaction, neither of which contain statements made by defendant, but those of a co-conspirator who was selling the same drugs as defendant from the same phone.

### III. PRE-TRIAL OPENING STATEMENT

**March 2 and 3, 2016 Overdose Incidents**

In approximately September 2015, Joshua Manning was released from prison and began using heroin. Manning lived in Maquoketa, Iowa, but obtained his heroin in nearby Dubuque, Iowa. By approximately October 2015, Manning began using his connections to heroin dealers to supply heroin to his acquaintances in Maquoketa. These acquaintances included Jeremy Naderman, A.K., B.S., and, later, M.V. On approximately one or two occasions per week between about October and December 2015, Manning purchased approximately ½ gram of heroin from his sources in Dubuque, and then supplied to his customers in Maquoketa with

11

the portion of the heroin that he did not use.  Between about December 2015 and March 2016, the frequency of these heroin purchases increased to about 3 or 4 times per week.  On a few occasions, Naderman rode with defendant to meet one of defendant's Dubuque heroin sources, known to Manning and Naderman only as "Lucky."  Manning and other witnesses will identify defendant as "Lucky."

In early March 2016, Manning requested to obtain approximately five grams of heroin from defendant on a "front."  Defendant agreed to do so, and was going to charge Manning $160 per gram, for a total of $800.  Manning then spoke with Naderman and agreed to split the five grams with him.  During the afternoon or early evening of March 2, 2016, Manning, Naderman, and Kelly made a plan to go to Dubuque to obtain the heroin Manning had requested from defendant.  Vanamburg arrived shortly before the group left for Dubuque, and agreed to put in money in order to obtain some heroin for himself.  Manning then contacted defendant by calling him at a phone number with the last four digits of 8904.

Around approximately midnight of March 3, 2016, the group then drove from Maquoketa to the area of Cleveland Avenue and State Street in Dubuque, which was where Manning and Naderman had previously met with defendant to purchase heroin.  When they arrived in that location, they parked and waited for defendant.  Defendant arrived in a silver or black vehicle that had a large sticker in the back window.  Manning alone exited the vehicle and entered the vehicle.  Yaree Martin (whom Manning knew only as "Lavelle," but other heroin customers knew as "V" or

12

"Velle") was driving the vehicle, and defendant was in the back seat. Defendant handed Manning a bag containing purported heroin, and Manning provided defendant partial payment for the heroin. Defendant told Manning that he knew where Manning's grandmother lived, which Manning took to be a threat if he did not repay defendant.

Defendant and Martin then dropped Manning off at the car where Naderman, A.K., and M.V. were waiting. The four then drove to the area of Bluff Street in Dubuque, where J.S. lived. Naderman and Manning went into J.S.'s apartment, while A.K. and M.V. remained outside in the car.[2] While inside J.S.'s apartment, Manning divided the substance between himself and Naderman, and either Naderman or Manning provided to J.S. a portion of the substance he had purchased from defendant. Manning and Naderman then returned outside to the vehicle, and Manning provided some of the substance he had purchased from defendant to A.K. and M.V. Inside the vehicle, all four individuals used the substance Manning had obtained from defendant. A.K. and M.V. lost consciousness after using the substance, and started having trouble breathing. Naderman then moved the vehicle from the parking lot to the street, and Manning called 911 to obtain emergency medical assistance for A.K. and M.V.

---

[2] The United States will call all four individuals from the vehicle as witnesses. The United States anticipates that the individuals from the vehicle will have different recollections as to when they used the substance Manning obtained from defendant.

13

When emergency medical responders arrived on scene, A.K. and M.V. were unresponsive with slow and shallow breathing, but were both sweating. Emergency responders administered naloxone (also called Narcan), an opiate reversal drug, and A.K. and M.V. regained consciousness and breathing function. Expert testimony will establish that, without the emergency medical intervention provided to A.K. and M.V. on March 3, 2016, both men had a substantial risk of anoxic brain injury and death as a result of using the heroin/furanylfentanyl defendant distributed.

Officers at the scene recovered drug paraphernalia (needles) and a baggie containing a powdery substance from the vehicle where A.K. and M.V. were found. The DCI Laboratory determined the substance in the baggie weighed .12 gram and tested positive for furanylfentanyl and heroin.

Furanylfentanyl is a synthetic opiate that was not listed in the federal controlled substance schedules in March 2016. Nevertheless, in March 2016, furanylfentanyl was an analogue of the Schedule II controlled substance fentanyl. The parties have entered a stipulation that the chemical structure of furanylfentanyl is substantially to the chemical structure of fentanyl, which is a Schedule II controlled substance. The parties have also stipulated that furanylfentanyl has a depressant effect on the central nervous system that is substantially similar to or greater than the depressant effect on the central nervous

14

system of fentanyl.[3]

After emergency responders revived A.K. and M.V., Manning and Naderman were permitted to leave the scene. No law enforcement officer searched Manning, Naderman, nor did any law enforcement officer go to J.S.'s residence to make contact that night. Naderman later returned to J.S.'s apartment and retrieved the substances Manning had purchased from defendant. Manning took his remaining portion of the substance he purchased from defendant home with him to Maquoketa.

During the early morning hours of March 3, 2016, J.S. used the substance Manning and Naderman had brought to him. Later that day, J.S.'s family became concerned because he failed to show up for work on March 3. At approximately 7:20 p.m., J.S.'s sister went to his residence and found him deceased in the bathroom. Lines of a powdery substance were found on the kitchen countertop next to a rolled up dollar bill. A baggie containing additional substances were found in a plastic baggie in the kitchen cabinet. The powder substances from the cabinet and countertop were later tested by DCI and determined to contain heroin and furanylfentanyl. An autopsy determined the cause of J.S.'s death was "acute mixed drug (opiates and furanylfentanyl) intoxication[.]" The evidence will show that, but for his use of the heroin/furanylfentanyl that defendant distributed, J.S.

---

[3] As a result of the stipulation, the United States will not be presenting expert testimony regarding the chemical structure and pharmacological effects of furanylfentanyl.

would not have died on March 3, 2016.

After the overdose incident with A.K. and M.V. on March 3, Manning was in contact with another friend he knew from Maquoketa, B.S. Manning met with B.S. and sold B.S. a portion of the substance he had left from defendant. On March 6, 2016, B.S. was found deceased in his residence in Davenport, Iowa. On a video game case immediately next to B.S.'s face, officers discovered chunks of a tan substance. The substance was sent to the DCI laboratory and was determined to weight .61 gram and to contain heroin and furanylfentanyl. An autopsy of B.S. determined he died as a result of a drug (morphine and tramadol) intoxication. Morphine is a metabolite of heroin. Furanylfentanyl and monoacetylmorphine (the other metabolite of heroin) were not identified in B.S.'s postmortem blood, urine, or vitreous fluid.

On March 31, 2016, a Confidential Source (CS) contacted an Investigator with the Dubuque Drug Task Force and said that "Lucky" (known to agents as defendant), contacted the CS and said Lucky was back in town. The CS said Lucky was "fully loaded" and waiting for a call from the CS to arrange a sale to the CS. "Fully loaded" was understood by Investigators to mean Lewis had heroin for sale.

At 11:38 a.m., the CS made a recorded call to a phone number ending in -8904. This is the same number that phone records show Manning's phone was in contact with on March 2 and 3, 2016, prior to the overdoses of A.K., M.V., and J.S. The phone was answered by a male the CS identified as Lucky (defendant).

Defendant told the CS to meet at a gas station parking lot located at 14th and Central Streets in Dubuque, Iowa.

At 11:54 a.m., the CS drove from the Dubuque Drug Task Force office to the meeting location, which was located in Dubuque, Iowa. The CS arrived in the parking lot at 1401 Central Avenue and called the -8904 number to let defendant know the CS had arrived. At 12:03 p.m., an Investigator watched defendant walk in the alley in the 1400 block of Iowa Street. Defendant met with Antwain Deshaun Spratt and walked toward the CS's vehicle. Spratt walked past the CS's vehicle, in a manner that appeared to be counter surveillance, and defendant got into the CS's vehicle. The CS then gave defendant $50 of pre serialized currency, and defendant knowingly and intentionally distributed one bag of purported heroin to the CS. The purported bag of heroin was later tested and determined to contain heroin. Defendant has previously pled guilty in federal court to distributing heroin to the CS on March 31, 2016.

On April 8, 2016, the Dubuque Drug Task Force conducted another controlled buy, utilizing the same CS. The CS contacted the same number ending in -8904, and spoke with a male. The CS did not know it at the time, but defendant was incarcerated on that date. Antoine Mitchell answered the phone and met with the CS later to sell the CS a substance that was later determined to contain heroin. Mitchell previously pled guilty to conspiring to distribute heroin, and has admitted to distributing heroin to the CS on April 8, 2016.

17

Other witnesses will testify to having purchased heroin from defendant on multiple occasions. Those witnesses will testify that they sometimes met with defendant (and sometimes Yaree Martin) in the area of Cleveland Avenue and State Street in Dubuque to complete heroin transactions.

Respectfully submitted,

KEVIN W. TECHAU
United States Attorney

By, s/Dan Chatham

DAN CHATHAM
Assistant United States Attorney
111 7th Avenue SE, Box 1
Cedar Rapids, IA   52401-2101
(319) 363-6333
(319) 363-1990 (Fax)
Dan.Chatham@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2017, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the parties or attorneys of record.

UNITED STATES ATTORNEY

BY: /s/   Dan Chatham